**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LISA JOHNSON-BARKER, as Administrator of the Estate of Markus Johnson,<br><br>Plaintiff,<br><br>v.<br><br>WEXFORD HEALTH SOURCES, INC.; THE BANTRY GROUP CORPORATION; SBW INVESTMENTS, LLC; TDWJR INVESTMENTS LLC; RICHARD W. TALARICO; HJP ACQUISITION LPG; the G. NORMAN MCCANN IRREVOCABLE TRUST FOR N. JEFFREY MCCANN; and the 2017 N. JEFFREY MCCANN FAMILY TRUST<br><br>Defendants. | ) | Case No. 2:26-cv-01725<br><br>Hon. J. Nicholas Ranjan |

**PLAINTIFF LISA JOHNSON-BARKER'S MEMORANDUM IN SUPPORT**
**OF MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Lisa Johnson-Barker, by and through her attorneys, respectfully moves for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 against Defendants Wexford Health Sources, Inc. ("Wexford") and the Bantry Group Corporation ("Bantry"), enjoining Wexford from transferring funds to Bantry, and Bantry from distributing monies that originated with Wexford to its shareholders and investors, until Wexford has set aside sufficient funds to cover a judgment on Plaintiff's civil rights claims against Wexford and its employees.

## INTRODUCTION

Plaintiff's son, Markus Johnson, died from severe dehydration while in the custody of the Illinois Department of Corrections ("IDOC") on September 6, 2019. Defendant Wexford was responsible for providing Mr. Johnson medical and mental health care pursuant to its contract with

the State of Illinois. Wexford failed in this responsibility. The shocking circumstances of Mr. Johnson's egregiously awful care and death were well documented, including in heartbreaking videos. He died at 21 with less than five months remaining on his sentence. His case is set for trial in November 2026, though Wexford has again moved to extend the trial date, claiming its attorneys are overburdened.

For many years—and certainly since Plaintiff, as Administrator of her son's estate, filed a lawsuit against Wexford in the Central District of Illinois (the "Underlying Case")—Wexford knew to expect millions of dollars in liability for Mr. Johnson's death. This reality was impressed upon Wexford in many ways, including through Plaintiff's settlement demands, the Illinois Department of Correction's multi-million dollar settlement of its own liability to Plaintiff, and jury awards in comparable cases. Nonetheless, since Plaintiff filed her civil rights claims in 2021, Wexford repeatedly transferred tens of millions of dollars to Bantry and its shareholders while failing to maintain an insurance policy sufficient to cover its exposure. These transfers have depleted Wexford's resources to such an extent that Wexford now claims not to have the wherewithal to pay the reasonably expected judgment in the Underlying Case.

Wexford's supposedly impaired condition is the result of its own financial manipulations. While the company continues to benefit from lucrative contracts in at least eight states, its distributions to Bantry—in the form of purported management fees and other unspecified transfers—appear calculated to drain the company of all, or substantially all, of its operating profits. Should Wexford be permitted to transfer additional funds or assets to Bantry or Bantry's shareholders, Plaintiff will suffer the irreparable harm of being forced to endure the expensive and complicated process of clawing back millions of dollars of improperly distributed funds before she can be compensated for her son's death.

## BACKGROUND

### I. Wexford's Corporate Structure

Since 1992, Wexford has provided medical and mental healthcare in correctional facilities across the country pursuant to contracts that paid it billions of dollars. The Bantry Group is Wexford's parent company and owns all of Wexford's capital stock. Wexford is Bantry's only operating entity. Wexford and Bantry share a Chief Executive Officer (Daniel Conn), a Chief Administrative Officer (Elaine Gedman), and a Chief Financial Officer (John Froelich). Jeffrey McCann—the son of Wexford's founder who, along with his siblings, owns approximately 80% of Bantry's outstanding stock—is Bantry's Chairman and Director.

Wexford has made repeated claims of insolvency. For example, in May 2026, a federal court entered a $3 million judgment against Wexford in a different civil rights matter. In post-judgment discussions, Wexford "repeatedly stated that it is having financial difficulties and repeatedly insinuated that it may have to seek bankruptcy protection." Dkt. 105 at 2, Pls.' Resp. in Opp to Defs.' Mot to Stay Execution of Judgment Pending Appeal, *Larkin v. Wexford Health Sources, Inc.*, No. 3:23-cv-3015 (C.D. Ill. May 22, 2026). Wexford has made similar statements to Plaintiff, as noted above and described in more detail below.

### II. The Underlying Case

Markus Johnson was 21 years old when he died in IDOC custody. When Mr. Johnson arrived at Danville Correctional Center in December 2018, his mental illness was well controlled, and he was in good physical condition. During his incarceration, however, Mr. Johnson experienced a precipitous deterioration in his mental and physical health. He stopped taking his psychiatric medications and, soon thereafter, stopped eating and drinking. He lost 61 pounds in just two months. Wexford providers observed and documented Mr. Johnson's failure to eat, his marked disorientation, and other obvious signs of a severe medical crisis, including chest pain,

abdominal pain, and jaundice. But as Mr. Johnson withered away, Wexford's employees showed utter disregard for his obvious and extreme distress. On his month-long procession to his death, Mr. Johnson received no meaningful care whatsoever. He died from severe dehydration while a stash of IV fluids sat untouched only steps away. He was fewer than five months away from release.

The care provided to Mr. Johnson was so egregious that the *New York Times* published a front-page story about it, explaining that his story was emblematic of the "failures of the nation's prisons to care for the mentally ill." It was titled "When Prison and Mental Illness Amount to a Death Sentence."

Plaintiff, Mr. Johnson's mother and the Administrator of his Estate, filed her Complaint on August 19, 2021, in the United States District Court for the Central District of Illinois. She alleges that by failing to provide Mr. Johnson with anything that resembled adequate medical and mental health care, Wexford and its employees were deliberately indifferent to Mr. Johnson's serious medical needs in violation of the Eighth Amendment of the United States Constitution. Plaintiff further alleges that such deliberate indifference in the face of obvious risk to Mr. Johnson caused Mr. Johnson's untimely death. Plaintiff also pleaded *respondeat superior* claims against Wexford, along with claims under the Illinois Wrongful Death statute, 740 ILCS 180/1, and the Illinois Survival Act, 755 ILCS 5/27-6.

In September 2022, Plaintiff demanded more than $20 million to settle the case, citing numerous recoveries of similar or greater magnitude on similar facts. In the four years since, the parties have spent thousands of hours on discovery and motion practice. On July 1, 2026, the district court presiding over the Underlying Case denied Wexford and its employees' motions for summary judgment on all counts, ruling that Wexford had "elected to engage" in the correctional health care business "with open eyes and clear understanding and experience" of the systemic

challenges of prison health care and "the obvious threshold requirement to not violate the constitutional rights of the imprisoned individuals they have been hired to care for."

Trial in the Underlying Case is currently set for November of this year (although Wexford's counsel recently filed a motion to continue the case to 2027). Plaintiff will seek compensatory damages, punitive damages, attorneys' fees, and costs. Wexford and its co-defendants will face joint and several liability. *Goudy v. Cummings*, 922 F.3d 834, 843 (7th Cir. 2019); *Watts v. Laurent*, 774 F.3d 168, 179 (7th Cir. 1985). Based on verdicts in comparable cases, the Defendants in the Underlying Case—including Wexford itself—can expect to face liability in the range of $20 to $50 million.[1] Indeed, given the horrifying circumstances of Mr. Johnson's death, his young age, and the degree of Wexford's culpability, a jury verdict may well exceed these figures. In addition, Wexford will be responsible for millions of dollars in attorneys' fees, costs, and interest.

## III. The Fraudulent Transfers

Wexford has provided healthcare services to the Illinois Department of Corrections for nearly 30 years. In 2011, the state awarded Wexford a contract worth over $1 billion to manage the Illinois correctional healthcare program. Numerous lawsuits, as well as a federal consent decree, have highlighted Wexford's liability risk stemming from its failures to provide minimally adequate healthcare in Illinois prisons. Even so, Illinois renewed Wexford's contract at the end of 2023 for a ten-year term at a cost of over $4 billion. The state rescinded the contract in June 2025.

---

[1] Damages in far less egregious cases than this one have run to tens of millions of dollars. In *Slevin v. Board Of Commissioners for County of Doña Ana*, 934 F. Supp. 2d 1270 (D.N.M. 2012), a jury awarded a $22 million verdict, including $6.5 million in punitive damages, for denial of medical and mental health treatment. But that case concerned conditions of confinement, and the detainee did not die. In *Estate of Huggins v. Eastern Health Care*, No. 03CP4301217 (S.C.), a jury awarded a $28.5 million verdict, including $7.5 million in punitive damages, against corporate medical defendant after a 43-year-old diabetic died in custody of insulin deficiency. That case, too, is less severe than this one, where 21-year-old Mr. Johnson died slowly and painfully of dehydration. And in *Barbaros v. Primecare Medical Inc.*, No. 11-cv-00413, 2016 WL 7337379 (M.D. Pa. 2016), a jury awarded an $11.8 million verdict against the corporate medical defendant and its staff after a prisoner died by suicide.

Still, Wexford remains the medical services provider for all correctional institutions in the New Mexico Corrections Department. It also has operative contracts in Arizona, Louisiana, Nebraska, New Hampshire, Texas, Virginia, and West Virginia. Wexford's revenue from its contracts is substantial. Based on public 2022 financials, for example, Wexford's operating profit was $37,803,001 million. On information and belief, the following years were similar.

Rather than using these substantial profits to cover its liability in the Underlying Case, including by purchasing insurance adequate to cover its liabilities, Wexford sent hundreds of millions of dollars to its parent company and shareholders during the years Plaintiff's civil rights case has been pending. Again using the public financial records as an example, in 2022, Wexford transferred $28,623,224 to Bantry for "management fees" and made an additional $19,753,469 in unspecified "transfers" that Bantry apparently distributed to shareholders. On information and belief, Wexford has continued making similar payments and transfers to Bantry every year from 2022 to the present.

As a result of these ongoing transfers and its insufficient insurance coverage, Wexford has admitted insolvency to its creditors. Indeed, on July 16, one of Wexford's lawyers stated that "Wexford has one foot in the grave and one foot on a banana peel"—an assertion similar to those made by Wexford to its creditors in the *Larkin* case, *supra.* More recently, counsel for Wexford informed Plaintiff's counsel that any settlement in the Underlying Case would necessarily reduce the settlement funds available for other pending suits against Wexford (and vice versa), suggesting that Wexford has a finite and inadequate reserve of funds to cover its legal liabilities.

Plaintiff promptly filed this lawsuit alleging fraudulent transfer to prevent Wexford from further dissipating assets that should be used to pay creditors, including Plaintiff.

Before filing this motion for preliminary injunction, Plaintiff asked Wexford and its co-defendants if they would agree to pause distributions for two weeks to see if the parties could potentially find a negotiated resolution to this case. Wexford would not agree and declined to provide documents to support its assertions that certain distributions were necessary for tax purposes, causing Plaintiff to file this motion.

**ARGUMENT**

The grant or denial of a preliminary injunction is within the sound discretion of a district court. *See Amalgamated Transit Union Local 85 v. Port Authority of Allegheny Cnty.*, 39 F.4th 95, 109 (3d Cir. 2022). A court will grant such relief where the movant shows that she is likely to succeed on the merits and is likely to experience irreparable harm absent an injunction. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176–79 (3d Cir. 2017). If these two "gateway factors" are met, a court will also weigh the possibility of harm to other interested persons and whether an injunction would serve the public interest. *Id.* It then "determines its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

Here, each of these factors weighs in favor of preliminary injunctive relief. Plaintiff is likely to succeed on the merits of her fraudulent transfer claim; she will suffer irreparable harm if Defendants continue to transfer funds prior to satisfying any judgment in her favor; no party will be prejudiced should the preliminary injunction—which seeks only to preserve the status quo—be granted; and preventing the type of fraud alleged is in the public's interest. Accordingly, the Court should grant Plaintiff's motion.

**I. Plaintiff has a strong likelihood of success on her fraudulent transfer claim.**

Under the Pennsylvania Uniform Voidable Transactions Act ("PUVTA"), a transfer by a debtor is voidable as to a creditor, regardless of when the transfer was made, if the debtor made the transfer:

> (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> > (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >
> > (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa. C.S.A. § 5104(a). Transfers are also voidable where the creditor's claim arose before the transfer was made and (1) "the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation" and (2) "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 12 Pa. C.S. § 5105(a).

Plaintiff is undoubtedly a creditor of Wexford. And even the limited information available to Plaintiff about Wexford and Bantry—a closely-held private company and its parent—indicates these companies likely committed either constructive fraud as defined in sections 5104(a)(2) and 5105(a) of the PUVTA, or actual fraud as defined in section 5104(a)(1).

**A. Plaintiff is Wexford's creditor.**

Under the plain language of section 5101(b), Plaintiff is Wexford's creditor. The PUVTA defines a creditor as "[a] person that has a claim" and a debtor as "[a] person that is liable on a claim." 12 Pa. C.S.A § 5101(b). The statute, in turn, defines a "claim" as "a right to payment,

whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *Id.* Thus, the fact that Plaintiff's lawsuit will not be "reduced to judgment" until untill November (or, if Wexford gets its way, 2027) does not change the fact that she has "claim" under the statute. *Klein v. Weidner*, No. 08-cv-3798, 2010 WL 571800, at *7 (E.D. Pa. Feb. 17, 2010) (identifying the plaintiff as a "present creditor" under the statute because she had a claim pending against the defendant at the time of the alleged fraudulent transfer, even though "she did not receive a formal judgment" until later); *Protocomm Corp. v. Novell, Inc.*, 171 F. Supp. 2d 459, 464 (E.D. Pa. 2001) ("A claim may be brought under this Act . . . by a party which has not yet received a judgment on a legal claim at the time of the transfer in question."); *In re Elliott*, 83 F. Supp. 771, 773 (E.D. Pa. 1948) ("A person who has a claim for damages for personal injuries, even though it is not reduced to verdict or judgment, is a creditor of the defendant within the meaning of the above Uniform Act."). Plaintiff has, therefore, been Wexford's creditor since at least August 19, 2021, when she filed the complaint in the Underlying Case.

Indeed, Plaintiff was arguably a creditor on the date of her son's death in September 2019. *See Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, (1st Cir. 2020) (assessing an identical definition of "creditor" and noting that the creditor's claim arose on the date of the injury in the underlying action); *see also In Re Carton*, No. 20-19781-VFP, 2023 WL 8057870, at *2 (D.N.J. Nov. 20, 2023) (same); *Canty v. Otto*, 304 Conn. 546, 561 (2012) (same); *In re Prosser*, No. 06-30009, 2009 WL 3270765, at *10 (D.V.I. Oct. 9, 2009) (same); *Klingman v. Levinson*, 114 F.3d 620, 627 (7th Cir. 1997) (same). Either way, Wexford has transferred tens of millions of dollars out of the operating business and to its parent company since Plaintiff became a creditor. Plaintiff is entitled to avoid those transfers and preclude further transfers under PUVTA.

**B. Wexford's constructive fraud.**

The PUVTA sets forth two different standards for constructive fraud. One applies "whether the creditor's claim arose before or after the transfer was made or the obligation was incurred." *See* 12 Pa. C.S.A. § 5104(a)(2). The other applies only when the "claim arose before the transfer was made or the obligation was incurred." *Id.* at § 5105(a). Because Plaintiff's claim arose before Wexford's transfers, she can—and does—allege constructive fraud under both provisions.

First, under section 5104(a)(2), a creditor must show that the debtor did not receive a reasonably equivalent value in exchange for a contested transfer and (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. 12 Pa. C.S.A. § 5104(a)(2). Under section 5105(a), a creditor must similarly show that the debtor made the transfer without receiving reasonably equivalent value in exchange, and that the debtor was insolvent at that time or became insolvent as a result of the transfer or obligation. 12 Pa. C.S. § 5105(a).

*1. Reasonably equivalent value*

Although the term "reasonably equivalent value" is not defined in PUVTA, the Third Circuit has explained that "a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'" *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (*quoting In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006)). To determine reasonably equivalent value, courts conduct a "totality of the circumstances" analysis. *Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002). This "entails the consideration of a variety of factors, such as the fair market value of the item or service received compared to the price paid, the arms-length nature

of the transaction, and the good faith of the transferee." *In re Burry*, 309 B.R. 130, 137 (E.D. Pa. 2004).

To cite one example documenting Wexford's practices during the period in question, publicly filed financial statements show that Wexford's operating profit in 2022 was $37,803,001. From that sum, it transferred $28,623,224—or roughly 74% of its net income—to Bantry for "management fees," leaving Wexford with only $9,108,594 in net income. Wexford transferred an additional $19,753,469 to Bantry that same year, a sum Bantry distributed to shareholders (one of whom is Bantry's Chairman and Director). It made these transfers at a time when Wexford was operating at a loss: the 2022 financials show that the company's total liabilities exceeded its assets by more than $23 million.

These were not arms-length transactions: Wexford and Bantry share a Chief Executive Officer, a Chief Administrative Officer, and a Chief Financial Officer. Bantry's Chairman and Director, Jeffrey McCann, is the son of Wexford's founder who, along with his siblings, owns 80% of Bantry's outstanding stock. The inside nature of these transactions is "of considerable importance" and supports a finding that Wexford did not receive reasonably equivalent value for either the management fees or the $19 million that ultimately went to shareholders. *In re Morris Commc'ns NC, Inc.*, 914 F.2d 458, 467 (4th Cir. 1990); *see also In re Furniture Factory Ultimate Holding, LP*, No. 20-12816, 2023 WL 5662747, at *14 (D. Del. Aug. 31, 2023) (reasonable inference that management fee transfers were fraudulent where defendants were on both sides of the transaction and benefitted at the expense of the debtor company); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 396 (3d Cir. 2009) ("close relationship" between a debtor and creditor suggests "that any transactions were not conducted at arm's length").

The fact that Wexford has repeatedly refused to provide Plaintiff's counsel with the management agreement between Wexford and Bantry (if such exists at all) further supports an inference that the amount transferred bore no meaningful relationship to any "management services" provided. *See In re Fitzpatrick Container Co.*, 2025 WL 3565495, at *6 (Dec. 11, 2025) (debtor stonewalling investigation into finances supported finding that debtor failed to receive roughly equivalent value).

*2. Insolvency*

Under the PUVTA, "[a] debtor is insolvent if, at fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." 12 Pa. C.S. § 5102(a). During the period relevant to this suit, and despite its operating profits, Wexford professes to have consistently operated at a loss, with liabilities exceeding assets. In 2021 and 2022, for example, two years for which financial statements are publicly available, Wexford's total liabilities exceeded its total assets by $11,065,053 and $23,549,971, respectively. During the same period, Wexford faced well over a hundred lawsuits around the country, resulting in tens millions of dollars in legal liabilities, as reflected by the "Accrued Professional Liability" on its balance sheet.

Less than two months ago, a Wexford attorney represented to Plaintiff that the company remains insolvent, with "one foot in the grave and one foot on a banana peel." Wexford and counsel paired this rhetoric with claims that the company does not have adequate funds to engage in reasonable settlement discussions or to pay the expected judgment in the Underlying Case. Wexford representatives have also stated that Wexford does not have insurance sufficient to cover its likely liability. Finally, Wexford representatives have suggested the loss of Wexford's Illinois contract in 2025 put the company in an even more precarious position. From these statements and Wexford's 2021-2022 financial documents, it is reasonable to infer that Wexford was insolvent at

the time it made every transfer to Bantry since Mr. Johnson's death, or became insolvent as a result of those transfers.

*3. Unreasonably small remaining assets*

The evidence also shows that Wexford's remaining assets were unreasonably small in relation to the "business or transaction" in which it was engaged. 12 Pa. C.S. § 5104(a)(2)(i). This issue "is ultimately one of foreseeability." *United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 119 (E.D. Pa. 2011). The provision is aimed at transactions that the parties should know would "leave the transferor technically solvent but doomed to fail." *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995). Like the "debts beyond ability to pay" test, described below, the unreasonably small assets test "takes into account, among other things, the debtor's present and prospective debts, and whether the retained assets are sufficiently liquid to enable the debtor to pay such debts as they become due." *Id.* (quoting 12 Pa. Cons. Stat. § 5104 cmt. 4); *In re Island View Crossing II, L.P.*, 604 B.R. 181, 200–01 (Bankr. E.D. Pa. 2019). The "fundamental inquiry" for both tests is "whether the debtor is and, on a continuing basis, will be able to pay its debts as they become due." *Rocky Mountain Holdings*, 782 F. Supp. 2d at 119.

Based on the financial information obtained to date and representations by Wexford's counsel, Plaintiff expects that discovery will further confirm that Wexford has transferred tens of millions of dollars out of the company each year since Markus Johnson's death. During the same period, Wexford operated with insufficient assets to meet its liabilities. As Wexford fully appreciates, the Underlying Case, based on similar verdicts, is likely to result in a judgment of tens of millions of dollars against Wexford and its indemnified employees. *See* p.5, n.1, *supra*. Based on these facts, it was entirely foreseeable at the time of the transfers that Wexford would lack

sufficient assets to pay its debts. Therefore, the transfers at issue left Wexford with remaining assets that were unreasonably small in relation to the "business or transaction" it was (and continues to be) engaged in.

*4. Debts beyond Wexford's ability to pay*

A claimant can also show constructive fraud if the evidence shows the debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." 12 Pa. C.S. § 5104(a)(2)(ii). This condition "is sometimes referred to as 'insolvency in the equity sense[.]'" Uniform Law Comment 5 to 12 Pa. C.S. § 5104. Wexford knew or should have known at the time of the 2022 (and subsequent) transfers to Bantry that it had financial obligations beyond its ability to pay. Indeed, by its own admission, Wexford was actually insolvent in 2021 and 2022, *see* section B(2), *supra*. Thus, with the evidence Plaintiff will be able to gather in the expedited discovery she has requested in her discovery motion, Plaintiff will be able to show that, at minimum, Wexford met "a condition often described as something *shy* of insolvency." *In re Fitzpatrick Container Co.*, 2025 WL 3565495, at *5 (emphasis added) (explaining that it would be "illogical" to find that an insolvent company did not also satisfy section 5104(a)(ii) of the PUVTA).

In sum, because Wexford (1) did not receive reasonably equivalent value in exchange for its transfers to Bantry, (2) was engaged in a business for which its remaining assets were unreasonably small, and (3) believed or should have believed that it would incur debts beyond its ability to pay, Plaintiff has shown a reasonable probability of proving constructive fraud under both subsections of 5104(a)(2). Because Wexford was also insolvent at the time of the transfers, Plaintiff has shown a likelihood of success under section 5105(a) as well.

**C. Wexford's actual fraud.**

To prove actual fraudulent transfer under the PUVTA, a claimant must show that the disputed transfer was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A). Because "individuals are rarely willing to admit intent, actual fraud is rarely proven by direct evidence." *In re Carbone*, 615 B.R. 76, 80 (Bankr. E.D. Pa. 2020) (quoting *In re Pennsylvania Gear Corp.*, 2008 WL 2370169, at *9 (Bankr. E.D. Pa. April 22, 2008)). Instead, the PUVTA identifies "badges of fraud" the Court may consider in "determining whether fraud has been proven by circumstantial evidence." *Id.* (internal quotation marks and citation omitted). They include:

> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the transfer;
>
> (3) the transfer or obligation was disclosed or concealed;
>
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) the transfer was of substantially all the debtor's assets;
>
> (6) the debtor absconded;
>
> (7) the debtor removed or concealed assets;
>
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 Pa. C.S. § 5104(b).

"Although the presence of a single . . . badge of fraud may cast suspicion on a transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud." *In re Roman Catholic Diocese of Harrisburg*, 640 B.R. 59, 74 (Bankr. M.D. Pa. 2022) (relying on the PUVTA and quoting *In re AgFeed USA, LLC*, 546 B.R. 318, 337 (Bankr. D. Del. 2016)). Here, the evidence suggests that at least seven of the eleven badges of fraud are present.

First, the transfer or obligation was to an insider (**Badge No. 1**). The Act's definition of "insider" is derived from the Bankruptcy Code. See 12 Pa. C.S. § 5101, Comment 8. The Code defines insider to include directors, officers, and persons in control of the debtor. See 11 U.S.C. § 101(31)(B). Bantry is an "insider" within the meaning of the statute because Wexford is owned entirely by Bantry, Wexford is the only operating entity of Bantry, Bantry's revenue is generated exclusively from ostensible "management services" to Wexford, and the companies share executive officers. *See In re Direct Response Media, Inc.*, 466 B.R. 626, 654 (D. Del. 2012) (plaintiff pled sufficient facts to suggest parent company was an "insider" where it shared "interlocking directorates," as well as a "cross-pollinated ownership and organizational structure"). This strongly supports a finding of actual fraud. *See, e.g., In re PennySaver USA Publishing, LLC*, 602 B.R. 256, 272 (D. Del. 2019) (finding first badge of fraud satisfied where debtor diverted a management fee to transferee); *In re Fitzpatrick Container Co.*, 2025 WL 3565495, at *6 (noting that given the transferee's position "at the Debtor's helm," "he would have been fully aware that with each successive transfer, FCC was rendered increasingly insolvent while its creditors' outstanding invoices piled up").

Wexford's concealment of information related to the transfers suggests that **Badge No. 3** is also present here. *See* section I(B)(1), *supra*; *In re Fitzpatrick Container Co.*, 2025 WL 3565495, at *6 (stonewalling investigation into finances supported finding on badges (3) and (8)). As is **Badge No. 4**: before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit. The transfers that Plaintiff is currently aware of were made after Plaintiff had filed the Underlying Case. *See Chestnut St. Consol., LLC v. Dawara*, 619 F.Supp.3d 489, 508 (E.D. Pa. 2022) (finding actual fraud where debtors had been sued and "were clearly aware that would face substantial liability as a result of their actions" at the time of transfer).

Because Wexford's net assets were negative at the time of the transfers, the contested transfers constituted substantially all of Wexford's assets (**Badge No. 5**), and the value of the consideration received by Wexford from Bantry was not reasonably equivalent to the value of the assets transferred (**Badge No. 8**). *See* section I(B)(1), *supra*. **Badge No. 9** is satisfied where Wexford was also insolvent after the transfer was made. *See* 12 Pa. C.S.A. § 5102; section I(B)(2), *supra*. And finally, because at least some of the transfers occurred shortly after Plaintiff filed the Underlying Case, **Badge No. 10** is also indicative of actual fraud.

Taken together, these factors strongly support a finding that Plaintiff has a "reasonable probability of success on the merits" under a theory of actual fraud. *See, e.g., NextGear Cap., Inc. v. Gutierrez*, 2021 WL 2137654, at *5 (M.D. Pa. May 26, 2021) (facts clearly indicated an "actual intent" to defraud plaintiff where four badges of fraud were satisfied).

## II. Plaintiff will suffer irreparable harm without an injunction.

The PUVTA explicitly allows courts to order injunctive relief as a remedy to fraudulent transfer. *See* Pa. C.S. § 5107(a)-(b) ("subject to applicable principles of equity" creditors under the PUVTA may obtain "an injunction against further disposition by the debtor or a transferee, or both,

of the asset transferred or of other property" and "any other relief the circumstances may require"). This provision "grants courts the broad authority to issue prejudgment injunctions that fit the exigencies of the particular case." *In re BYJU's Alpha, Inc.*, 661 B.R. 109, 121 (D. Del. 2024) (describing identical language in Delaware's fraudulent transfer act). Thus, injunctive relief is not an "extraordinary remedy" under the PUVTA, but a standard one provided by statute.

And courts grant *preliminary* injunctive relief where PUVTA claimants show a reasonable likelihood of success on those claims and reason to believe the debtor-defendant may continue transferring funds—even where the potential harm is monetary. *See, e.g., Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485 (3d Cir. 2000) ("the request for money alone itself does not foreclose a claim of irreparable injury"); *Chestnut St. Consol., LLC*, 619 F.Supp.3d at 498 (temporary restraining order entered pending the resolution of plaintiff's claims under the PUVTA); *NextGear Cap., Inc.*, 2021 WL 2137654, at *7 (granting preliminary injunction barring further transfer of defendants' property pending resolution of plaintiff's fraudulent transfer claims under the PUVTA).

Because Wexford has informed Plaintiff that it is unable to pay a reasonable settlement or the judgement expected at trial, Plaintiff has shown a high risk of irreparable harm. *In re BYJU's Alpha, Inc.*, 661 B.R. at 125–26 (claimant showed possibility of irreparable harm where defendants implied that they did not have the means to satisfy a judgment other than the missing funds). Plaintiff expects the discovery in this case to confirm that Wexford makes substantial payments to Bantry every year, much of which Bantry then distributes to shareholders. The risk of harm is particularly high where, on September 8, Wexford moved to continue the trial in the Underlying Case from November of this year to early 2027. Should this motion be granted over Plaintiff's objection, Wexford would have still more time with which to deplete its already insufficient funds

with transfers to Bantry and shareholders. This, too, suggests the need for preliminary injunctive relief. *See Star Creations Inv. Co., Ltd. v. Amron Dev., Inc.*, No. 95-cv-4328, 1995 WL 495126, at *7 (E.D. Pa. 1995) (finding irreparable harm where plaintiff demonstrated that defendant was likely to engage in fraudulent transfers, with actual intent to defraud or hinder creditors); *Mitsubishi Power Sys. Americas, Inc. v. Babcock & Brown Infrastructure Grp. US, LLC*, No. 4499-VCL, 2009 WL 1199588, at *4 (Del. Ch. Apr. 24, 2009) (finding irreparable injury where evidence showed "that [defendant] has engaged in fraudulent transfers to its affiliates and intends to do so again in the near future").

**III. The balance of harms favors Plaintiff**

The balance of harms favors a preliminary injunction. An injunction would serve only to preserve the status quo for a few months by preventing Wexford and Bantry from transferring assets before it pays any judgment owed to Plaintiff after the upcoming trial, currently set for November 2026. The prejudice to Wexford is therefore minimal. *See Cherry Hill Programs, Inc. v. Sullivan*, No. 21-cv-20248, 2022 WL 1094254, at *5 (D.N.J. Apr. 12, 2022) ("A preliminary injunction by this Court would not harm [defendant] as it would simply preserve the status quo and prevent him from using information that he does not have any right to use in any event."). By contrast, allowing transfers to continue will severely prejudice Plaintiff by making any judgment substantially more difficult, if not impossible, to recover.

Finally, the public interest is served by granting this injunction. Plaintiff has demonstrated a reasonable likelihood of success on the merits and irreparable injury, and Pennsylvania has a legitimate interest in preventing fraud and ethically questionable conduct by its businesses. *See Barbey v. Unisys Corp.*, 256 Fed. Appx. 532, 533 (3d Cir. 2007) ("Pennsylvania has an interest in preventing fraud by Pennsylvania companies."); *Am. Tel. & Tel. Co. v. Winback & Conserve*

*Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff"); *NextGear Cap., Inc.*, 2021 WL 2137654, at *7 (finding it was "clearly in the public's best interest . . . to ensure that any satisfaction that may be had to mitigate the harm caused by the Defendants' actions be protected so that those who may otherwise turn to the courts for justice in the future will not be disincentivized from doing so because they feel recompense will not be obtained.").

**CONCLUSION**

For the foregoing reasons, the Court should issue a preliminary injunction stating that (1) Defendant Wexford shall not transfer funds to Bantry, equity holders, or investors until Plaintiff's claims under the Pennsylvania Uniform Voidable Transactions Act are decided and, similarly, that (2) Bantry shall not transfer funds already in Bantry's control to equity holders or investors until Plaintiff's claims under the Pennsylvania Uniform Voidable Transactions Act are decided.

Dated: September 10, 2026

Respectfully submitted,

*/s/ Carl A. Frankovitch*
Carl A. Frankovitch
Attorney for Plaintiff

Carl A. Frankovitch, Esq.
FRANKOVITCH, ANETAKIS,
SIMON DECAPIO & PEARL LLP
337 Penco Road
Weirton, WV 26062
cfrankovitch@faslaw.com
Tel.: (304) 723-4400
Fax: (304) 723-4400

and

Howard Kaplan*
Sarah Grady*
Matthew Underwood*
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, Illinois 60614
(312) 852-2184

** W.D. Pennsylvania Admission Forthcoming*

**CERTIFICATE OF SERVICE**

I, Carl A. Frankovitch, an attorney, hereby certify that on September 10, 2026, I caused the foregoing to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

*/s/ Carl A. Frankovitch*
Carl A. Frankovitch
Attorney for Plaintiff